IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ALLONHILL, LLC, | : | Chapter 11 |
| | : | |
| Reorganized Debtor. | : | Case No. 13-11482 (KG) |
| _____ | : | |
| ALLONHILL, LLC, | : | |
| Appellant, | : | Civ. No. 19-879-LPS |
| | : | (Consolidated Appeals)[1] |
| v. | : | |
| | : | |
| STEWART LENDER SERVICES, INC., | : | |
| | : | |
| Appellee. | : | |
| _____ | : | |
| STEWART LENDER SERVICES, INC., | : | |
| | : | Civ. No. 19-938-LPS |
| Cross-Appellant, | : | |
| | : | |
| v. | : | |
| ALLONHILL, LLC, | : | |
| | : | |
| Cross-Appellee. | : | |

_____

**MEMORANDUM**

## I.  INTRODUCTION

This appeal arises in an adversary proceeding brought by reorganized debtor Allonhill, LLC

("Allonhill").  Plaintiff/counterclaim defendant Allonhill filed an adversary proceeding against

defendant/counterclaim plaintiff Stewart Lender Services, Inc. ("SLS") asserting various causes of

action related to Allonhill's sale of assets to SLS under an asset purchase agreement (the amended

version of which is referred to here as the "APA"), and SLS asserted several counterclaims,

including a counterclaim for outstanding receivables owed to it under the APA.  Following a five-

_____

[1] By Order dated June 24, 2019, the Allonhill appeal (Civ. No. 19-879-LPS D.I. 1) and the SLS
cross-appeal (Civ. No. 19-938-LPS D.I. 1) were consolidated for procedural purposes under Civ.
No. 19-879-LPS ("Consolidated Appeals").

day trial, the Bankruptcy Court issued its opinion (A1894)[2] and order (A2024), *In re Allonhill, LLC*, 2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019) ("Decision"), denying Allonhill's claims for relief and damages and also denying SLS's counterclaims. Both parties appealed the Decision.

## II.     BACKGROUND

### A.     The Allonhill Business

Sue and Harvey Allon (the "Allons") formed Allonhill in September 2008, to provide mortgage due diligence and credit risk management ("CRM") services. In the wake of the financial crisis in 2007 and 2008, the demand for mortgage due diligence and CRM services increased and began to focus on three areas: (1) a robust quality control function for loan origination, (2) post-purchase audits and forensic reviews relating to repurchase matters and put-back litigation, and (3) ongoing portfolio monitoring, including data management and servicer review. (A2312) Allonhill marketed its services to a variety of entities in the residential mortgage loan industry, employing a model which could be applied to private and public clients. Allonhill's clients consisted of private banks, such as Goldman Sachs, Citibank, Credit Suisse, UBS, Nomura, and Barclays, and private non-bank entities, including Quicken Loans, Pacific Union, Five Star, and Flagstar. (A1424) Allonhill also performed work for Government Sponsored Enterprises ("GSEs") Fannie Mae and Freddie Mac, the FDIC, and the U.S. Treasury. Allonhill broke its services into five business lines: (1) loan file review ("LFR") or due diligence, consisting of foreclosure, conduit, quality control, and transactional work; (2) CRM; (3) staffing; (4) consulting; and (5) licensing. (A2505)

After Allonhill's formation, the economic realities of the market, including the extremely low volume of "private label securitizations" – that is, the issuance of mortgage-backed securities

---

[2] The appendix (D.I. 24-27) to Allonhill's opening brief (D.I. 23) is cited herein as "A__," and the appendix (D.I. 38-41) to SLS's answering brief (D.I. 37) is cited herein as "S__."

by the private sector, predominantly investment banks – required that Allonhill focus on other services. Post-financial crisis, diligence opportunities were generated by GSEs, primarily Fannie Mae and Freddie Mac, which entailed reviewing the origination and servicing practices of banks and other entities involved in the mortgage business.

Allonhill had its first GSE engagement in 2009. (*See* D.I. 28 at 10; A1814) Allonhill continued to work for the GSEs in 2010, in addition to hedge funds and banks. (*See* A1814) In 2011, Allonhill began to perform independent foreclosure reviews ("IFRs"), after the federal government issued consent orders requiring mortgage servicers to retain independent experts supervised by the Office of the Comptroller of Currency (the "OCC"). Allonhill had two large IFRs in 2011: one for Wells Fargo and the other for Aurora Bank. (*See* A1815-16)

Allonhill struggled to turn a profit and needed significant capital investment from the Allons. It was not profitable in 2008, and posted a net loss in excess of $4 million in 2009. (A1446; S0198; S0212) The Allons had to make capital contributions to the business of $4.5 million in 2009. (A1447; S0589) Mr. Allon had to make an additional capital infusion of $1.4 million in 2010, and loaned Allonhill another $550,000 in early 2011. (S0589; A1447; A1449) In 2012, Allonhill posted a net income of less than $200,000, barely breaking even. (S0208; A1447) The Allons' capital contributions were necessary to sustain the operations of Allonhill's business. (A1449)

Allonhill was hired in spring 2011 as the independent consultant for Aurora Bank. (A1429 at 65) Its work with Aurora and on a similar project for the OCC helped its revenue to spike to $52 million in 2011. (S0225; A1448) In May 2012, however, the OCC directed Aurora to terminate Allonhill on the grounds that Allonhill had failed to disclose significant conflicts of interest compromising its independence. (S0611; A1497) Allonhill then sued Aurora for payment of $22

million in outstanding receivables; Aurora countersued for fraud, seeking the return of $24 million in fees it had already paid. (A0338-39)

In the months following the loss of the Aurora business, Allonhill lost the other project it had been performing in connection with the OCC (A1430) and had to lay off half its employees, including managers and administrative staff (A1432; A1454). Consequently, Allonhill in 2012 began to "turn down new business" in securitizations. (S0264) Around the same time, Allonhill temporarily shifted its method of funding private label securitization work by requiring clients to pay the employee costs of loan reviews as incurred rather than on completion. (S0264; A1432) Allonhill's "clients were very upset" at this change. (S0434) Allonhill also made changes to its pricing methodology and operations in an effort to better deliver projects at acceptable margins. (S1014)

Despite these changes, Allonhill's EBITDA continued to be negative in each month of 2013. (S0370; A1450; A1451) Total losses from January to August 2013 amounted to $4.9 million. (S0370) In that period, the Allons contributed an additional $3.2 million to the business. (S0594-95)

B.      Sale of the Allonhill Business to SLS

It became clear that Allonhill "needed to do something." (S0195) The Allons engaged an investment banker, Ryan Abbe of JMP Securities, who conducted a robust marketing process, contacting over two dozen potential strategic and financial buyers. (A1552-55; S0168-69; S0267; S0325; S0326; S0343) SLS emerged as the only interested buyer. SLS's CEO, Jason Nadeau, believed that SLS needed to focus on the "recovery market" – the opportunities that would be available as the economy moved away from the financial crisis and loan originations (including private label securitizations) increased. (A1594-95; A1609)

At this point, "most" of Allonhill's work, and nearly all of its work for GSEs, "related to non-performing loans or loans in default." (A1428; A1535-36; A1537-38) Although the GSEs continued to securitize mortgages in the wake of the financial crisis, the GSE securitizations – what Allonhill refers to as "public securitizations" – did not provide significant revenue-generating opportunities to third-party loan due diligence firms like Allonhill. (A2525; S0565; S0176-78) In the 12 months prior to closing the sale to SLS, nearly 70 percent of Allonhill's revenues were derived from non-securitization work for just three clients: Fannie Mae, Freddie Mac, and Flagstar. (S0370; A1452)

SLS was attracted to the opportunity to acquire Allonhill based on what it believed Allonhill could do in the future, as the market rebounded, so SLS proposed that part of its purchase price would be in the form of an earnout. (S0327; A1598) Allonhill agreed that an earnout made sense. (A1461) Extensive negotiations over the form of the earnout culminated in the execution of a letter of intent on June 27, 2013 (the "LOI"). (A1599; A1471; A1556) Due diligence then began in earnest. Ultimately, the SLS Executive Committee approved the deal. (A1605; A1608; A2757)

On or about August 21, 2013, Mr. Nadeau, Ms. Allon, and James Davis, SLS's Vice Chairman, met in Denver, Colorado. During the APA negotiations, Ms. Allon, as a representative of Allonhill, affirmatively represented to SLS that she had a strong reputation in the industry, had great customer service relationships, and was well-positioned to grow the Allonhill business. (A0336)

The APA was executed and the sale closed on August 28, 2013 ("Closing"). The Final terms are memorialized in the APA and various related agreements.[3] (A2757; S0401; S0556; A2836) Pursuant to the APA, SLS agreed to purchase substantially all of the assets of the Allonhill

---

[3] In connection with the APA, the parties also entered into additional agreements dated as of August 28, 2013: (a) Employee Leasing Agreement, (b) Indemnity Agreement, and (c) Escrow Agreement.

business (the "Business"), including all customer contracts and accounts receivable other than the disputed receivable related to the Aurora litigation. (A2763; A2767) As consideration, SLS paid Allonhill $15 million at the Closing, assumed Allonhill's go forward liabilities (other than those associated with the Aurora litigation), and agreed to the earnout. (A2767)

The primary term of the earnout lasted three years. In order to be eligible for the earnout, the Business had to meet certain revenue hurdles each year (the "Earnout Hurdles"). If the Earnout Hurdles were met, the APA provided a formula by which Allonhill could be paid a percentage of the revenue earned above the hurdle. (A2767-68)

While SLS purchased all contracts and receivables at Closing, certain of Allonhill's customer contracts would not be formally assigned to SLS until after the Closing. (A1618) Given this delay, Allonhill would have to service those contracts in its name even post-Closing, until the subsequent assignment. Because SLS hired substantially all of Allonhill's employees as of the Closing, the parties entered into an Employee Leasing Agreement ("ELA"), pursuant to which SLS would "lease" employees back to Allonhill, so that contracts could be performed in Allonhill's name. The parties agreed that this arrangement would be cash neutral to Allonhill and that all receivables collected by Allonhill post-Closing would be turned over to SLS net of any actual costs incurred by Allonhill as the result of this arrangement. (A1490; A1608-09)

### C. Ms. Allon's Termination

Prior to the sale, Ms. Allon had moved away from running the day-to-day operations of Allonhill, and she wanted to assume the same non-operational role post-closing. (A1476) The plan was to have Ms. Allon serve in a client-facing role, where she would market the Business, attend conferences, and provide leadership, rather than being significantly involved in the day-to-day operations. (A1475-76; A1606) Shortly after the sale, Mr. Nadeau became aware of reputational

issues, as well as dysfunction within the legacy Allonhill business for which Ms. Allonhill had been responsible, and terminated her employment.  (A1613)

On January 10, 2014, just days before Ms. Allon was terminated, and just four months after the sale, she and Mr. Allon had sent a letter to Mr. Nadeau raising several issues with the manner in which SLS was operating the Business (the "January 2014 Letter").  (A2889)  Mr. Nadeau testified that the decision to terminate Ms. Allon had been made before the receipt of the January 2014 Letter.  (A1613-14)  On advice of counsel, Mr. Nadeau did not respond to the January 2014 Letter. (A1614)

### D.    Post-Sale Operations of the Business

Post-sale, SLS offered employment to all of Allonhill's operations and sale teams.  (A1477) Every member of the Allonhill management team joined SLS, including (initially) Ms. Allon. (A2836)  Structurally, the Allonhill Business became a separate division of SLS.  (A1669)  The day-to-day activities of the Business were managed by legacy Allonhill personnel.  (A1670; A1531) The two post-sale heads of operations were both legacy Allonhill employees.  (A1670-71; A1673) On the sales side, Dan Gallery, head of sales for the Business before the acquisition, joined SLS in the same role he had held at Allonhill, and his entire sales team joined him.  (A1564-65)  SLS made good faith efforts to retain key employees, including through payment of retention bonuses and promotion of legacy Allonhill employees.  (A1608-09; S1020; A1475; A1541; A1574; A1673)

SLS discovered post-sale that Allonhill's pricing approach was unsustainable and did not adequately account for the costs of operating the business.  (A1612-13; A1672; S0187)  SLS therefore adjusted Allonhill's pricing metrics.  (A1613)  The difference between the pricing methodologies was that, unlike Allonhill, SLS's model accounted for certain overhead costs above the project management level.  (A1570-71)

In the post-sale period, SLS took on limited transactional engagements. (S0184) By late 2014, however, it became clear that transactional work proved too costly in light of the volume available. (S0184) The private label securitization market also failed to rebound as hoped. (S0951; A2515; S0562; A1610; A1505) Accordingly, in the fall of 2014, and following a study of its securitization business in relation to the market, SLS made the decision to pull back from private label securitization work, ultimately concluding that the volume did not support the cost of reviews at prices that the market would bear. (A1615-16; S0183; S0544-48)

At the time of the sale, 70 percent of Allonhill's revenue had been concentrated in three customers – Flagstar Bank, Fannie Mae, and Freddie Mac – and nearly all of the business from these customers related to default loans. After the sale, default-related work for these customers declined. (A2501; A1536; A1611) For example, on September 13, 2013, less than two weeks after the sale, Flagstaff gave notice that it would be moving default-related work in-house. (S0432) Additionally, by the spring of 2014, the Business had lost four large projects for Fannie Mae and Freddie Mac, which had together accounted for over 50 percent of Allonhill's revenue. (A1768-70; S0370)

### E.    Failure to Meet Earnout Hurdles

The Business did not generate sufficient revenue to exceed the revenue hurdles in the APA necessary to trigger the earnout payments. (A0337) The November 10, 2014 Year One Earnout Statement showed gross revenue for the Business for the first year of the earnout of $13.1 million, nearly $4 million below the $17 million revenue hurdle. (S0553) The November 16, 2015 Year Two Earnout Statement showed revenue of approximately $9.7 million, again well below the $17 million revenue hurdle. (S0558) The November 15, 2016 Year Three Earnout Statement showed revenue of approximately $7.3 million and operating losses in excess of $1.1 million. (S0758)

After three years of mounting losses, SLS sold the Business and other assets in December 2016 for less than $2 million. (S0762; S0780)

### F.     Failure to Remit the Outstanding Amount

After the sale closed, clients of the Allonhill Business, in connection with customer contracts, receivables, and rights to payment that had been purchased by SLS pursuant to the APA, continued to send payments by check and wire transfer to Allonhill ("Customer Collections"). (A0337)  Following the August 2013 Closing, Allonhill, from September 2013 through March 2014, recorded cash collections from customers of the Business.  (A0337)

In November 2013, Allonhill raised the possibility of amending the APA to shift the start date for the earnout period, believing a later start date would benefit Allonhill.  (S0452-60; A1489-90)  SLS agreed to the amendment provided that Allonhill remit any then outstanding Customer Collections to SLS, which Allonhill had to that point failed to do.  (S0458)  The parties agreed on the amounts collected by Allonhill and the expenses Allonhill would be permitted to deduct, and then executed the amendment to the APA.  (S0452; A2905)

In January and February 2014, Allonhill turned over Customer Collections to SLS totaling $6,608,309.15 (the "Turned Over Funds") through two separate transfers ("Transfers").  (A0338)  Subsequent Customer Collections totaling $675,474.75 (the "Outstanding Amount") were collected by Allonhill after the last Turnover Date and remain with the Allonhill estate today.

### G.     The Aurora Judgment

In October 2012, when the litigation between Allonhill and Aurora began, Aurora had paid Allonhill approximately $24 million for work performed through January 2012, and there was approximately $22.5 million in unpaid costs and fees incurred by Allonhill.  In August 2013, when the Allonhill sale to SLS closed, the Aurora Litigation was in the discovery phase.  On March 5, 2014, the Colorado trial court issued its Findings of Fact, Conclusions of Law, and Order, including

its findings that: (1) Allonhill's representations about its conflicts of interest were "false and reckless, and omitted significant, material information;" (2) Allonhill was "reckless" in misrepresenting to and omitting information from Aurora; and (3) Allonhill's performance under the IFR contract was "abysmal" and "feckless." (*See* A339 ¶ 27 (stipulated facts))  The trial court awarded Aurora damages of $25,845,329 plus prejudgment interest, consisting of the $24,045,329 Aurora had paid to Allonhill for work performed through January 2013, plus $1,800,000 that Aurora had paid to Allonhill to transition the IFR work.  (*Id*. at ¶ 28)

Allonhill appealed.  *See Allonhill, LLC v. Aurora Commercial Corporation f/k/a Aurora Bank, FSB*, No. 14-CA-0740 (Colo. Ct. App.).  More than 2 ½ years later, on October 6, 2016, the Colorado appeals court affirmed the trial court's holding that Allonhill was liable for breach of contract and fraud, but reversed the trial court's damages order, concluding that the Aurora contract's $2 million limitation on damages was enforceable.  The appeals court remanded for the trial court to enter damages in favor of Aurora based on application of the contractual damages cap.

On remand, on November 17, 2017, the Colorado trial court issued an order entering judgment for Aurora in the amount of $2 million.  On June 6, 2018, Allonhill and Aurora settled their litigation for $2.05 million.  (S1005-08)

## H.     The Allonhill Bankruptcy and the Adversary Proceeding

Meanwhile, back on March 26, 2014, Allonhill had filed for bankruptcy, in large part due to the March 5, 2014 Colorado trial court award to Aurora of $25.9 million.  On January 15, 2015, SLS filed a proof of claim against Allonhill seeking $675,474.75, that is, the Outstanding Amount.  (Adv. D.I. 23 Ex. C)  On March 3, 2015, the Bankruptcy Court approved the parties' agreement providing it exclusive jurisdiction over the resolution and determination of any action between the parties "arising out of the or relating to the APA," including any actions relating to any "Earnout Statement" and any claims asserted by SLS.  (S0001)

Allonhill filed a complaint initiating the adversary proceeding that is the subject of its appeal. In its Amended Complaint, Allonhill asserted 12 claims for breach of the APA and negligent misrepresentation under Colorado state law; nine claims for avoidance and recovery of certain transfers pursuant to Bankruptcy Code §§ 547(b), 548(a)(1)(B), 544(a) and (b)(1), and state law; and sought declaratory relief pursuant to § 541(a) of the Bankruptcy Code as to the estate's ownership of certain cash in Allonhill's operating account. Allonhill's common law claims were based on SLS's alleged breach of section 2.2(e) of the APA, requiring SLS to use commercially reasonable efforts to operate the Business as it had been operated previously, and section 2.2(c) of the same agreement, requiring the parties to cooperate in good faith to adjust the earnout hurdles.

SLS denied that it had made any misrepresentation or breached the APA. SLS further alleged that the failure of Allonhill to receive any earnout payments was the result of factors beyond SLS's control, including the loss of numerous customer contracts following the closing of the sale, Allonhill's reputational problems, and the overall failure of the private label equity security market to rebound as anticipated. With regard to Allonhill's claims to avoid and recover the Turned Over Funds, SLS alleged that (i) these were transfers of accounts and contract receivables that SLS had purchased as part of the APA and, therefore, were not avoidable, and (ii) Allonhill was solvent on the date of each such transfer. SLS asserted three counterclaims for breach of contract, conversion, and unjust enrichment relating to the Outstanding Amounts. Allonhill denied liability for any of SLS's counterclaims.

## I.        The Decision

On April 25, 2019, the Bankruptcy Court issued the Decision. The Bankruptcy Court ruled against Allonhill on its preference claim, finding that Allonhill was solvent as of the dates the Turned Over Funds were transferred, according the Aurora liability a value equal to the amount for which it ultimately settled years later, which was just a little more than $2 million. *See Allonhill*,

2019 WL 1868610, at *20, *50.  The Bankruptcy Court ruled that Allonhill's payment of the

Turned Over Funds through the Transfers could not be challenged as fraudulent transfers separate

and apart from the APA transaction, which was supported by adequate consideration.  *Id*. at *47.

The Bankruptcy Court also denied relief with respect to Allonhill's claims that SLS had breached

sections 2.2(c) and 2.2(e) of the APA, *see id*. at *45-47, and SLS's claim that Allonhill had

breached the APA by failing to remit the Outstanding Amount, *see id*. at *54.  Accordingly, the

Bankruptcy Court denied both parties' claims for relief and damages.

On May 20, 2019, Allonhill timely filed its Notice of Appeal from the Decision (A2025) and

SLS timely filed its Notice of Cross-Appeal (S0011).  The Consolidated Appeals are fully briefed.

(D.I. 23, 37, 48, 50)  On March 6, 2020, the Court held oral argument.  (D.I. 53; *see also* D.I. 56

("Tr."))  After the argument, the parties submitted letter briefs relating to the status of SLS's cross-

appeal.  (*See* D.I. 56, 57)

## III.  JURISDICTION AND STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158.

Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final

judgments, orders, and decrees" and discretionary jurisdiction over appeals "from other

interlocutory orders and decrees."  28 U.S.C § 158(a)(1) and (3).  In conducting its review of the

issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and

exercises plenary review over questions of law.  *See Am. Flint Glass Workers Union v. Anchor

Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999).  The Court must "break down mixed questions of

law and fact, applying the appropriate standard to each component."  *Meridian Bank v. Alten*, 958

F.2d 1226, 1229 (3d Cir. 1992).  Decisions on whether to admit evidence are reviewed for abuse of

discretion.  *See Waldorf v. Shuta*, 142 F.3d 601, 626-27 (3d Cir. 1998).

## IV.    DISCUSSION

### A.    Allonhill's Claims for Relief and Damages

#### 1.    Preference Claim

Allonhill appeals the Bankruptcy Court's holding that Allonhill cannot avoid the Transfers to SLS of the Turned Over Funds – that is, the $6,608,309.15 in Customer Collections remitted to SLS in January and February 2014 – as preferential payments.  SLS identifies what it contends are three independent, adequate grounds on which the Decision on this preference claim can be affirmed: that Allonhill was actually solvent at the time of the challenged Transfers, that the Transfers are not antecedent debt but were already SLS's property, and that Allonhill received new value (i.e., the amendment to the APA with respect to the earnout date) in exchange for the Transfers.

The Court disagrees with the Bankruptcy Court's determination that Allonhill was solvent at the time of the Transfers, as the Court does not believe that the appropriate measure of the Aurora debt was the $2.05 million for which the parties settled the Aurora litigation more than four years after Allonhill filed for bankruptcy.  Because the Court is remanding anyway with respect to SLS's cross-appeal, the Court will remand Allonhill's appeal of the preference rulings as well.  On remand, the Bankruptcy Court will determine whether SLS's remaining two defenses to the preference claim require denial of Allonhill's claims (determinations which may, but may not, require further factual findings).

#### a.    Solvency at the Time of the Challenged Transfers

An essential element of a preference claim is that the debtor was insolvent on the date that the alleged preferential transfer took place.  *See In re Winstar Commc'ns, Inc*., 348 B.R. 234, 276 (Bankr. D. Del. 2005) ("The date of the transfer . . . is the relevant date for solvency."); *see also In re Am. Classic Voyages Co*., 367 B.R. 500, 514 (Bankr. D. Del. 2007), *aff'd sub nom. In re Am.*

*Classic Voyages, Co.*, 384 B.R. 62 (D. Del. 2008) ("Plaintiffs must now prove, by a preponderance of the evidence, that the Debtors were insolvent on the Transfer Date."); *In re Davis*, 120 B.R. 823 (Bankr. W.D. Pa. 1990) (holding that because debtor "was solvent as of date of allegedly preferential transfers," such "transfers were not preferences").

The Bankruptcy Court determined that, as of the dates of the Transfers in January and February 2014, the fair market value of Allonhill's assets exceeded the fair market value of its liabilities, making Allonhill solvent by at least $3.6 million on those dates. *See Allonhill*, 2019 WL 1868610, at *48. Allonhill appeals one part of the Bankruptcy Court's solvency determination: the Bankruptcy Court's valuation of the Aurora liability as being $2.05 million; that is, valuing the Aurora litigation at the time of the 2014 Transfers as being equal to the amount for which Allonhill and Aurora eventually settled their litigation in 2018.

Allonhill argues that the Aurora liability should be valued at $25.9 million, which is the amount of the trial court judgment, which was entered in March 2014, just weeks after the January and February 2014 transfers. To Allonhill, the correct approach to valuing the Aurora liability requires looking to the information known at a time proximate to the date of the Transfers. In support of its position, Allonhill emphasizes the undisputed fact that it was entry of the trial court judgment of $25.9 million that triggered Allonhill's filing for bankruptcy. Allonhill also suggests that the Bankruptcy Court's approach problematically disrupts settled expectations, allowing a debtor everyone has long understood to have been insolvent to be found, years later and based solely on hindsight, actually to have been solvent during the preference period and when it filed its bankruptcy petition.

SLS defends the Bankruptcy Court's approach. In doing so, SLS focuses on what it portrays as accuracy, arguing that there is no reason to ignore what is now known about the true and correct value of the Aurora liability, given that this value had been finally and accurately determined to be

only $2.05 million in 2018, when the Aurora litigation was settled.  SLS contends that the caselaw supports its approach, as does the trial testimony of its expert, Guy Davis.

Both parties agreed at oral argument that there is no binding Third Circuit authority on this issue (Tr. at 10, 55), so how to value the Aurora liability in the circumstances presented here constitutes an issue of first impression.  Importantly, the parties also agree that the Aurora liability is a "disputed" liability and not a "contingent" liability.  (*See* D.I. 28 at 33-38)  A liability is disputed, and not contingent, where the facts giving rise to the liability have already occurred and there is no future event that must occur to establish liability.  *See* C. Ryan Stewart, Contingent Liabilities and Disputed Claims in the Context of a Bankruptcy Solvency Analysis, Bankruptcy Valuation and Solvency Insights 55 (Winter 2014); *see also In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 150 (Bankr. C.D. Cal. 2013) ("Thus, because the events giving rise to the Judgment occurred pre-petition and prior to each of the transfers at issue, the Judgment is not a contingent debt and was not contingent as of any of the relevant transfers.").  In other words, the parties agree that it was known at the time of the Transfers that Allonhill was liable to Aurora, but it was not known with certainty how much Allonhill would ultimately have to pay Aurora.  By contrast, a contingent liability is one for which the debtor may or may not ultimately be liable.[4]

---

[4] One of the complicating factors in this appeal is that it is unclear whether, in fact, the Aurora liability should be treated as disputed as opposed to contingent.  As noted earlier in this Memorandum, Allonhill had claims against Aurora for up to $22 million; Aurora's claims for $24 million were actually counterclaims.  As of the date of the January and February 2014 Transfers, the Colorado trial court had not decided the claims or counterclaims.  To this Court, it seems at least possible that (from the perspective of February 2014) Allonhill would not have been found liable to Aurora.  An additional complication is that given the possibility of an appeal – which, in fact, Allonhill took, and which materially reduced the Aurora judgment from $25.9 million to (effectively) $2 million – it is arguably not true that all of the facts relating to the Aurora case should be deemed to have occurred by the time of the Transfers.  Nevertheless, given the parties' agreement that the Aurora liability is to be treated as disputed and not contingent, the Court will do so.

The relevant issue is how to value the Aurora liability as of the Transfer dates in January and February, 2014, when, as of those dates, the Aurora litigation was pending and no judgment had been entered. As SLS pointed out during oral argument (*see* Tr. at 52-53), one potential methodology would be to consider only the information available as of the Transfer Dates, and to value the liability based upon the likely outcome of the litigation given those facts. Neither party argued for this approach, in the Bankruptcy Court or before this Court, so the Court will not consider this possibility.

SLS, like the Bankruptcy Court, cites cases and commentators supporting the view that the Court should look at whether the disputed claim was resolved after the transfer dates and use that resolution for valuing the claim. *See Imagine Fulfillment*, 489 B.R. at 150; *S.E.C. v. Antar,* 120 F. Supp. 2d 431, 443 (D.N.J. 2000), *aff'd*, 44 F. App'x 548 (3d Cir. 2002); Contingent Liabilities and Disputed Claims 56. The Bankruptcy Court also relied on *Antar. See Allonhill*, 2019 WL 1868610, at *49. *Antar* concerned alleged fraudulent transfers by defendant Sam M. Antar ("Sam M."). 120 F. Supp. 2d 431. Sam M. engaged in securities fraud in the 1980s, but was not found liable for securities fraud until 1998. *Id.* at 434, 443. In between those dates, in 1991 and 1997, Sam M. made a series of transfers that the SEC sought to avoid as constructively fraudulent. *Id.* at 435. The court held that Sam M. was insolvent at the time of the transfers based upon the amount of a judgment that was entered against him for securities fraud after the transfers were made. *Id.* at 443. As the Court explained:

> It is now clear that the value of the SEC's unliquidated claim against Sam M. was, and is, approximately $15 million, exclusive of pre-judgment interest in the amount of approximately $42 million as ordered by this court. Because the SEC's claim was based on Sam M.'s securities fraud in the 1980s, Sam M. possessed this debt at the time of all the 1991 and 1997 transfers.

*Id*. (internal citations omitted).

While *Antar* is instructive, the Court agrees with Allonhill that it (and the other authorities

relied on by SLS) involves a situation where there was no "contemporaneous judgment on

'knowable' disputed claims existing at the time of pre-petition transfers."  (D.I. 28 at 34)  *See also*

*In re Turner & Cook, Inc*., 507 B.R. 101, 109 (Bankr. D. Vt. 2014) ("When a liability was

**contingent** [i.e., not "disputed"] at the time of the challenged transfers but is reduced to judgment

before the court's insolvency determination, however, a court may permissibly use the judgment

amount in valuing the contingent liability at the time of the transfers."); *In re W.R. Grace & Co.*,

281 B.R. 852, 867 (Bankr. D. Del. 2002) (considering value of future tort claims that had yet to be

brought for purposes of solvency analysis); *In re Pilavis*, 233 B.R. 1 (Bankr. D. Mass. 1999) (court

may use hindsight as guide to valuation where judgment is entered in interim).

Here, the undisputed facts are that: (i) a bench trial in the Aurora litigation had been

completed in the Colorado state court in December 2013; (ii) the Transfers Allonhill seeks to avoid

in its preference claim occurred in January and February 2014; (iii) the Colorado trial court handed

down its opinion on March 5, 2014, determining that Allonhill was liable to pay Aurora $25.9

million; (iv) the Aurora state court judgment precipitated Allonhill's bankruptcy filing, which

occurred on March 26, 2014; (v) the Aurora litigation continued on appeal, with the Colorado

appellate court ordering enforcement of the $2 million cap on damages at the time of the Transfers

and, on October 6, 2016, remanding to the trial court; (vi) the Colorado trial court entered judgment

in the amount of $2 million on November 17, 2017; (vii) Allonhill and Aurora settled their litigation

for $2.05 million on June 6, 2018; (viii) trial in the Bankruptcy Court occurred December 3-7, 2018;

and (ix) the Bankruptcy Court issued its Decision, valuing the Aurora liability at $2.05 million, on

April 25, 2019.  Under these (quite likely unusual) circumstances, and when the parties have agreed

the Aurora liability is a disputed and not contingent liability, and they have only offered the Court

the choice valuing the Aurora liability "contemporaneously" based on evidence available near the

time of the Transfers (e.g., through the March 2014 filing of the bankruptcy petition) or valuing it "accurately" based on the amount the litigation was ultimately resolved for only years later (after trial, appeal, remand, and settlement), the Court concludes that Allonhill's contemporaneous method is more appropriate.[5]

Under the circumstances here, where for five years (2014 to 2019) the parties ordered their affairs on the understanding that Allonhill was insolvent, the Court is concerned about the consequences of upsetting settled expectations by affirming a ruling that necessarily hinges a solvency determination on a litigation outcome that post-dates a bankruptcy filing by several years. This concern is heighted by the lack of cases (so far as the parties and the Court can discern) where, as Allonhill argues, a "later judgment many years down the road was used to find that a debtor is solvent instead of insolvent." (Tr. at 10)

As further evidence of Allonhill's insolvency at the time of the Transfers, Allonhill points to SLS's proof of claim, which it contends is a binding judicial admission. (D.I. 28 at 32) SLS filed a proof of claim on January 13, 2015, which explained (in an addendum) that Allonhill committed "multiple, separate breaches of the APA and other Sale documents," including making "representations under the APA related to Allonhill's solvency." (A0126) Even assuming a proof of claim could be treated as a judicial admission about a fact – a contention Allonhill makes but is not free of controversy, *see Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) ("The scope of judicial admissions is restricted to matters of fact which otherwise would require

---

[5] Contrary to SLS's critique, the Court finds nothing inconsistent in Allonhill's contention that some post-Transfer evidence should be considered in valuing the Aurora liability, while opposing setting the value of the Aurora liability at the amount it was resolved for years later. In the Court's view, there is a substantial difference between considering the post-Transfers trial court judgment – which occurred just three weeks after the last of the Transfers and was the precipitating event for Allonhill's bankruptcy – and considering the appellate judgment and settlement, which occurred two years later, did not trigger the bankruptcy, and did not occur at all contemporaneously with the date on which the Court is assessing Allonhill's solvency.

evidentiary proof, and does not include counsel's statement of his conception of the legal theory of a case.") – SLS is correct that its proof of claim makes no definitive statement regarding Allonhill's solvency on the transfer dates. (*See* A0126) (attachment to Proof of Claim saying nothing more than, in part of single sentence, "Allonhill breached representations under the APA ***related to*** Allonhill's solvency") (emphasis added) The Court's conclusion that Allonhill was insolvent at the time of the Transfers is based on the $25.9 million contemporaneous value of the Aurora liability, not on SLS's proof of claim.

Allonhill also challenges the Bankruptcy Court's admission of the opinion of SLS's expert, Guy Davis, who advocated the view that the Aurora judgment should be valued at $2.05 million, consistent with the legal authorities on which the Bankruptcy Court relied. Allonhill has failed to show that the Bankruptcy Court abused its discretion by admitting Davis's testimony. *See Waldorf*, 142 F.3d at 626-27 (holding that "absent an abuse of discretion, [appellate court] will not substitute [its] own judgment for that of the trial court regarding the admission or exclusion of expert testimony"). Solvency is an issue that is regularly subject to expert testimony, and the Bankruptcy Court reasonably relied on Mr. Davis's mathematical calculations in making its solvency determination. (A1938-39) Nor was it an abuse of discretion for the Bankruptcy Court to cite certain articles SLS cited in its pre- and post-trial briefing (D.I. 28 at 40), *see Allonhill*, 2019 WL 1868610, at *48-50, which were not admitted into evidence but are the type of secondary source or treatise courts may properly cite to for support of a legal conclusion, *see Houser v. Folino*, 2016 WL 791934, *5 (W.D. Pa. Mar. 1, 2016). Again, the Court's conclusion that Allonhill was insolvent at the time of the Transfers is based on the contemporaneous value of the Aurora liability, not any abuse of discretion by the Bankruptcy Court in connection with admitting Davis's contrary opinion or citation to certain articles.

Given the Court's conclusion, the undisputed value of the Aurora liability at the time of Allonhill's bankruptcy filing on March 26, 2014 was $25.9 million and, therefore, Allonhill was insolvent at that time. It follows that Allonhill was also insolvent weeks earlier, at the time of the January and February 2014 Transfers. Accordingly, Allonhill's preference claim is not defeated on the basis of solvency.

### d.       Other Bases for Denying Allonhill's Preference Claim

SLS points to two other bases on which the Bankruptcy Court's denial of Allonhill's preference claim can, it contends, be affirmed: (1) that the Transfers of the Turned Over Funds "did not constitute payment on account of an antecedent debt," *Allonhill*, 2019 WL 1868610, at \*51-52; and (2) "Because the release of the Customer Collections was in exchange for modification of the Earnout period, new value was exchanged, and the Turned Over Funds cannot be avoided as preferential payments", *id*. at \*52. While the Court agrees with much of what SLS is arguing on both issues, the Court will remand for the Bankruptcy Court to determine whether one or both of these defenses is sufficient to defeat the preference claim, and whether further development of the record is appropriate.

SLS argues that the Transfers "did not constitute payment on account of an antecedent debt but, rather, the turnover of accounts and receivables that SLS purchased pursuant to the APA." (A2013) "[W]here property is held by the debtor as bailee, agent or trustee, the property does not become part of the debtor's estate and is not an 'interest of the debtor in property' subject to avoidance under section 547(b)." *In re Appalachian Oil Co., Inc.*, 2012 WL 1205640, at \*3 (Bankr. E.D. Tenn. Apr. 11, 2012) (citing *City of Springfield Mass. v. Ostrander*, 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers.")).

Here, Allonhill stipulated that the Transfers represent collections on "customer contracts, receivables and rights to payment that had been purchased by SLS pursuant to the APA." (A0337-38) The parties agreed that this arrangement was to be "cash neutral" to Allonhill – requiring the turnover of all receipts purchased by SLS net of only Allonhill's direct expenses. These are established facts in this litigation and will be binding on remand.

SLS argues that the facts establish that Allonhill acted as a mere conduit for amounts that SLS had purchased pursuant to the APA. The Court cannot, on the present record, conclude that this is correct (although the Court is not finding that it is incorrect). Allonhill argues that the Bankruptcy Court did not address its arguments that SLS failed to perfect a security interest as required by Colorado law, that there is no evidence to support a bailment, and that the funds at issue were commingled with estate funds. Because (in part) the Court is remanding on SLS's counterclaim, the Court will also remand for the Bankruptcy Court to determine whether further development of the record is necessary with respect to the antecedent debt defense.

SLS argues that it provided new value to Allonhill in exchange for the Transfers, in the form of SLS's agreement to amend the start of the earnout period. Allonhill requested amending the APA to shift the start date for the earnout period from September 1 to November 1, believing that the later start date would benefit Allonhill. (S0452; A1489-90) SLS agreed to the amendment in exchange for Allonhill remitting any then-outstanding Customer Collections to SLS (S0458), which Allonhill was already obligated to do but refusing nonetheless. Upon reaching agreement on the amounts collected and expenses Allonhill would be permitted to deduct (S0452), the parties executed the amendment to the APA (S0452, A2905).

This modification of the APA constitutes new value to the estate, *see, e.g.*, *In re Spada*, 903 F.2d 971, 975 (3d Cir. 1990), notwithstanding that Allonhill never received any earnout payment. Allonhill thought its requested delay in the earnout period was valuable, and pushed for that change,

and there is no clear error in the Bankruptcy Court's finding that the requested amendment had value. (S0452; A1489-90) This is an established fact in this litigation and on remand will be binding. However, the parties agreed at oral argument that if the denial of the preference claims turns on SLS's new value defense, the Third Circuit's decision in *Spada* requires the Bankruptcy Court to make a definitive finding as to the amount of the new value provided. (Tr. at 23, 68-70) Because it did not, the Court will remand for further development of the record and findings on this defense (if the Bankruptcy Court reaches this defense).

In sum, SLS may be correct that the Transfers were not on account of an antecedent debt and/or were made in exchange for new value to Allonhill. If so, the remand should result in denial of Allonhill's preference claim. Because the Court is remanding with respect to the SLS cross-appeal, and for the reasons further explained above, the Court will also remand for the Bankruptcy Court to make further factual findings (if necessary) and determine whether the denial of the preference claim may be affirmed based on one or both of SLS's other defenses.[6]

## 2. Fraudulent Transfer Claims

Allonhill asserted two fraudulent transfer claims. First, it alleged that the sale, as embodied in the APA, was a fraudulent transfer. Second, it alleged that when Allonhill undertook the Transfers after the Closing, they constituted separate transactions that were also constructively

_____

[6] To the extent that the decision on remand results in SLS having to return funds to the estate, two additional issues will need to be addressed: the § 502(h) amount and the creditor cap. (*See* D.I. 42 at 34 n.12; Tr. at 46-47) SLS has asserted a claim under § 502(h) of the Bankruptcy Code, and if forced to return the alleged preferential transfers to the estate, there would need to be a determination of the amount due as between the parties with respect to that claim. With respect to the creditor cap, Allonhill sought, to the extent it was successful in avoiding any transfers, recovery of those avoided transfers pursuant to § 550 of the Bankruptcy Code. Because the Bankruptcy Court concluded that Allonhill could not prevail on its avoidance claims, it denied the § 550 claim. *Allonhill*, 2019 WL 1868610 at *52. The Bankruptcy Court noted, however, that even if Allonhill had prevailed on any avoidance claim, Allonhill could not recover "in excess of outstanding creditor claims" because the result would be a "windfall" to equity – namely, the Allons. Because the avoidance actions were denied, the Bankruptcy Court never reached this issue.

fraudulent. The Bankruptcy Court ruled that the sale was not a fraudulent transfer – and Allonhill has not appealed that ruling. With respect to the later Transfers, the Bankruptcy Court held that "Allonhill cannot assert a separate fraudulent transfer claim with respect to the Turned Over Funds" because "those amounts were transferred to SLS pursuant to the APA." *Allonhill,* 2019 WL 1868610, at *47.

The Court agrees. As the Bankruptcy Court correctly concluded, the APA was the product of a robust marketing process and arms' length negotiations, the consideration SLS provided under the APA was reasonably equivalent value for the assets it acquired, and among those assets acquired pursuant to the APA were the Turned Over Funds.

On appeal, Allonhill argues that the Bankruptcy Court's conclusion is "contrary to its finding that the consideration for the [Turned Over Funds] was the agreement to amend the start of the Earnout Period." (D.I. 28 at 44) But the Bankruptcy Court did not find that the agreement to amend the earnout period constituted consideration for the Transfers. Rather, the Bankruptcy Court found that the agreement to amend the earnout period constituted ***new value*** sufficient to provide a defense to a potential preference claim. SLS had the right to the Transfers pursuant to the APA, but Allonhill thereafter wrongly refused to comply with its obligation to transfer such funds; subsequently, SLS induced Allonhill to comply with its transfer obligation (which was already an obligation imposed on Allonhill by the APA) by providing Allonhill the additional consideration of a delayed earn-out period.

The Bankruptcy Court correctly held that Allonhill could not assert a fraudulent transfer claim relating to the Turned Over Funds separate and distinct from the claim it asserted in relation to the APA. Its findings and conclusions with respect to the fraudulent transfer claims will be affirmed.

### 3.    Breach of Contract Claims

The Bankruptcy Court concluded that Allonhill's claims for breach of contract failed because "SLS fully performed under the APA and, in any event, Allonhill did not establish damages." *Allonhill*, 2019 WL 1868610, at *41. Allonhill argues on appeal that the Bankruptcy Court erred because SLS breached several provisions of the APA. The Court will affirm the Bankruptcy Court's determinations.

### a.    Section 2.2(c) of the APA

Allonhill contends SLS breached APA section 2.2(c), which provides:

> For purposes of this Section 2.2 and the preparation of each Earnout Statement, the Parties shall cooperate in good faith to adjust the Earnout Hurdles, if necessary, to take into account the effect of any change in the recognition of revenues, the occurrence of acquisitions, divestitures or other Business Material Adverse Effect, that results in an adverse change to the Revenue or the Earnout Revenue Multiple for any portion of the Earnout Period; provided that no such adjustments shall be made without the mutually written agreement of the Parties.

(A2768-69) As the Bankruptcy Court pointed out, key to the understanding of this APA provision is the term "Business Material Adverse Effect" ("BMAE"), which is defined narrowly in the APA as:

> [A] material adverse effect on the business, assets, properties, financial condition or results of operations of the Business, taken as a whole; provided that no event, change, circumstance or effect (by itself or taken together with any and all other events changes, circumstances or effects) that results from or arises out of or is related to any of the following shall constitute or be deemed to contribute to a "Business Material Adverse Effect", or be taken into account in determining whether a "Business Material Adverse Effect" has occurred or may, would or could occur[.]

A2802 (emphasis omitted). The definition then goes on to list a series of occurrences which do not give rise to a BMAE, including:

> (a) changes in general economic conditions in the United States or changes in conditions in the global economy generally;

(b) changes in conditions in the financial markets, credit markets or capital markets in the United States; . . .

(d) **changes affecting the industry generally** in which the Business operates;

(e) the **resignation or termination of any employee of the Seller who is associated with the Business following the announcement of the Transactions**; . . .

(i) any **failure, in and of itself, by the Business to meet internal or external projections or forecasts or revenue or earnings predictions** (provided that the cause or basis for the Business failing to meet such projections or forecasts or revenue or earnings predictions may be considered in determining the existence of a Business Material Adverse Effect unless such cause or basis is otherwise excluded.

*Id*. (emphasis added).  The Bankruptcy Court concluded that "these broad exclusions – which are only a partial list – demonstrate how narrowly the parties drafted the obligation to renegotiate the Earnout Hurdles."  *Allonhill*, 2019 WL 1868610, at *45.

The Bankruptcy Court did not clearly err in finding that "SLS made no significant changes to the Business," and to the extent that SLS made changes, they were driven by market forces and, thus, did not give rise to a BMAE in light of the expansive exceptions.  *Id.*

By late 2014, it had become clear to SLS that, just as Allonhill had found, transactional work proved too costly given available volume.  *See id.*  The private label securitization market also failed to rebound as hoped in conjunction with the overall decline in delinquencies and increase in originations.  (S0951; A2515; S0562; A1610; A1505 at 369)  Before making the decision to withdraw from the securitization market, SLS conducted a study of its securitization business, working with "the teams in Denver to identify what opportunities were there, ways we could do the business, potential ways to reprice, other opportunities, [and] ways to potentially stay in that business."  (S0541)  SLS summarized its analysis in a presentation prepared in October 2014, ultimately concluding that the volume simply was not there to support the cost of the reviews at

prices that the market would bear.  (S0544-48; A1615-1616 at 108-09)  In communicating its decision to withdraw from securitization work, SLS emphasized to clients that it would retain the talent and technology, so that if the securitization market returned, SLS would be there to service it. (A1616-17; A2952)

Moreover, the Bankruptcy Court concluded correctly that there is no evidence that SLS failed to "cooperate in good faith to adjust the Earnout Hurdles."  *Allonhill*, 2019 WL 1868610, at *46.  "This is because there was never an opportunity for renegotiation given Allonhill's bankruptcy."  *Id.*  In March 2014, Allonhill filed for bankruptcy.  After SLS delivered the Year One Earnout Statement in November 2014, the parties tolled the time for Allonhill to challenge the statement, and then agreed that all disputes relating to the APA, including all disputes regarding the earnout, would be decided by the Bankruptcy Court.  The Bankruptcy Court correctly held that the parties' agreement superseded any obligation in the APA to renegotiate.  (A1956-57)  Contrary to Allonhill's contention, the Allons' January 2014 Letter did not trigger an immediate obligation to renegotiate the Earnout Hurdles.  (D.I. 28 at 53)  Allonhill identifies no basis in the APA for its position.  Nor is there evidence to support Allonhill's contention that by January 2014 SLS had already decided the earnout hurdles could not be met.  A December 2013 illustrative projection provided by Mr. Nadeau to Ms. Allon does not lead to the conclusion Allonhill invites the Court to reach.

Additionally, as the Bankruptcy Court observed, to meet its burden of proof on its claim that SLS breached section 2.2(c) of the APA, Allonhill would have to establish all of the following: (1) there was a BMAE; (2) such BMAE resulted in an adverse change to Revenues or the Earnout Revenue Multiple (as defined in the APA); (3) following any adverse change caused by a BMAE, SLS, in bad faith, refused to renegotiate the Earnout Hurdles; (4) where the hurdles would have been set in any hypothetical renegotiation; (5) the revenue of the Business would have exceeded the

newly negotiated Earnout Hurdles; and (6) what the earnout would have been under such revised hurdles.  Even if Allonhill had shown a BMAE (which it did not), Allonhill presented no evidence at trial and cites in its briefing no evidence to prove any of elements (2) through (6) necessary for its breach of contract claim.

The Court will affirm the Bankruptcy Court's denial of Allonhill's claim that SLS breached Section 2.2(c) of the APA.

### b.      Section 2.2(e) of the APA

Allonhill urges the Court to reverse the Decision denying its breach of contract claims on the basis that SLS breached section 2.2(e) of the APA.  Allonhill argues that the Bankruptcy Court erred in concluding that SLS used commercially reasonable efforts to operate the Business as it had been run by Allonhill pre-APA.

Section 2.2(e) of the APA required that "[SLS] shall use commercially reasonable efforts to operate the Business and use the Target Assets in a manner consistent in all material respects with [Allonhill's] ordinary course operation of the Business and use of the Target Assets."  As the Bankruptcy Court correctly observed, "Section 2.2(e) imposes two overlapping obligations on SLS – the obligation to use 'commercially reasonable' efforts to operate the Business 'consistent in all material respects' with Allonhill's pre-APA operation of the Business, and the obligation to not take any actions in 'bad faith' that would avoid or limit a potential Earnout payment."  *Allonhill*, 2019 WL 1868610, at *41.

SLS argues that "commercially reasonable efforts" do not require a party to act in a manner that would harm its commercial interests, as that would – by definition – not be "commercially reasonable."  The evidence supports a finding that post-sale, nearly every key legacy Allonhill employee joined SLS and continued to operate the business from the same Denver office.  (A1475-77; A1531; A1541; A1564-65; A1608-09; A1670-75; A2836; S0530; S1020)

Allonhill contends that the termination of Ms. Allon is evidence that SLS breached section 2.2(e), and that the Bankruptcy Court ignored or misconstrued such evidence. (D.I. 28 at 48) Allonhill argues that post-sale, Ms. Allon had a key role, for which she was paid $250,000 per year, but SLS's isolation of Ms. Allon, followed by the purportedly unjustified termination in January 2014, prevented her from fulfilling her duties. (*Id.*) These arguments ignore the critical finding by the Bankruptcy Court that certain of Ms. Allon's testimony post-sale about her treatment was simply "not credible." *Allonhill*, 2019 WL 1868610, at *42. The record supports the finding that prior to the sale, Ms. Allon had stepped away from running Allonhill, and that post-sale she wanted to assume the same non-operational, client-facing role. (A1475-76) There is also evidence to support a finding that Ms. Allon was causing some harm to the Business. (A1483 at 281-82; A1604 at 62-64; A1611-12 at 91-96; A1691-92 at 410-13; S0196; S0441) None of the Bankruptcy Court's findings with respect to Ms. Allon – including that "[s]ignificant issues with Ms. Allon's reputation in the industry and among clients became apparent in the four months after the APA closed," and that "[s]ignificant internal issues with Ms. Allon's management style also became apparent" – are clearly erroneous, as all are supported by the record. *See, e.g.*, *Allonhill*, 2019 WL 1868610, at *42.

Nor has Allonhill shown there was any error in the Bankruptcy Court's conclusion that SLS's withdrawal from unprofitable securitization work did not breach section 2.2(e). *See Allonhill*, 2019 WL 1868610 at *44. The Bankruptcy Court concluded that Allonhill made the same decision in 2012 when it withdrew from the such work. In Allonhill's view, the Bankruptcy Court's finding was clear error because, while SLS "exited securitizations," Allonhill had merely "temporarily de-emphasized" securitizations. (D.I. 28 at 37) There was no clear error in the Bankruptcy Court's finding of no material difference between the decision that Allonhill had previously made and the decision that SLS subsequently made. The evidence shows that both Allonhill and SLS decided to pull back from securitization work because the volumes simply were

not there to support the costs. (S0263-64; A14557; A1533; A1615-17; A2515; A2952; S0250; S0565)

Allonhill contends on appeal that, unlike its decision to withdraw from the securitization market in 2012, SLS exited both private and public securitizations. (D.I. 28 at 47) While Allonhill claims that "other firms were profiting from public securitizations and GSE-related work in general," and therefore SLS "acted unreasonably and in a manner that did not promote the growth of the Business" (D.I. 28 at 47-48), Allonhill cites no record evidence to support its contention. At trial, Ms. Allon testified that public securitizations generated "not a lot" of diligence work, and "we weren't on it." (A1457) To the extent that public securitizations were not a focus of the Business post-sale, SLS operated consistent with Allonhill's pre-sale operation and did not violate Section 2.2(e). Mr. Gillen testified in detail that the manner in which GSEs acquire loans for securitization does not require the same type of loan-by-loan quality control review as private label securitizations. (S0176-78)

Finally, even if SLS's decision to exit securitizations constituted a material change from the way that Allonhill operated the business, Allonhill failed to show that such a change was not commercially reasonable. SLS carefully studied the securitization market and only made the decision to exit that market after it determined that this work would only produce losses. (S0541)

The Court finds sufficient evidence in the record to support the Bankruptcy Court's conclusions that nothing else Allonhill points to – including SLS's decisions regarding the pricing model, staffing, and cost cutting – constituted violations of section 2.2(e). There was no clear error in the Bankruptcy Court's findings that all of what Allonhill faults SLS for was either not materially different from the way Allonhill operated the business or was commercially reasonable. Accordingly, the Court will affirm the Bankruptcy Court's denial of Allonhill's claim that SLS breached section 2.2(e) of the APA.

### c. Breach of Contract Damages

The Bankruptcy Court concluded that Allonhill's breach of contract claim fails for the

independent reason that Allonhill did not establish breach of contract damages. *Allonhill*, 2019 WL

at *46. Given the Court's affirmance of the Bankruptcy Court's denial of the breach of contract

claims on multiple other grounds, the Court will not address this additional potential deficiency.[7]

### B. SLS's Cross-Appeal of Denial of Its Counterclaim

SLS asserted a counterclaim against Allonhill for breach of contract due to Allonhill's

failure to turn over the Outstanding Amount, which the Bankruptcy Court denied. (A0307) The

Bankruptcy Court only briefly addressed SLS's counterclaim. In fact, the entirety of its ruling (in

an otherwise extremely thorough opinion) is set forth below:

> SLS seeks by counterclaim to recover the Outstanding Amount
> totaling $675,474.75. The Outstanding Amount comes from
> Allonhill's collections on customer contracts, receivables and/or
> rights to payment which SLS purchased pursuant to the APA. Under
> Colorado law, it is SLS's burden to prove that it performed, that
> Allonhill did not and that SLS was thereby damaged. Accordingly,
> the SLS claim fails.

*Allonhill*, 2019 WL 1868610, at *54.

On appeal, the parties agree that the basis for the Bankruptcy Court's ruling on SLS's

counterclaim is unclear. (*See* Tr. at 41-42, 89; *see also* D.I. 56, 57) The Court will remand for the

Bankruptcy Court to clarify which element or elements of SLS's counterclaim SLS failed to prove

and to make any further factual findings or conclusions that are required.

---

[7] Allonhill's complaint that the Bankruptcy Court did not "discuss" certain exhibits is no basis to
reverse the Decision. The finder of fact has no obligation to address every piece of evidence that
touches on an issue. It is clear that the Bankruptcy Court, in its lengthy opinion, thoughtfully
weighed the evidence – and the credibility of the witnesses – in rejecting Allonhill's contract
claims.

## V.    CONCLUSION

For the reasons set forth above, the Court will remand Allonhill's appeal and SLS's cross-appeal for further proceedings not inconsistent with this Memorandum.  An appropriate Order follows.

March 31, 2020                                    HONORABLE LEONARD P. STARK
Wilmington, Delaware                              UNITED STATES DISTRICT JUDGE