IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ALLONHILL, LLC, | : | Chapter 11 |
| Reorganized Debtor. | : | Case No. 14-10663-KG |
| ALLONHILL, LLC, | : | |
| Appellant, | : | Civ. No. 19-879-LPS |
| | : | (Consolidated Appeals)[1] |
| v. | : | |
| STEWART LENDER SERVICES, INC., | : | |
| Appellee. | : | |
| STEWART LENDER SERVICES, INC., | : | |
| | : | Civ. No. 19-938-LPS |
| Cross-Appellant, | : | |
| v. | : | |
| ALLONHILL, LLC, | : | |
| Cross-Appellee. | : | |

## MEMORANDUM

## I.     INTRODUCTION

This appeal arose in an adversary proceeding brought by reorganized debtor Allonhill, LLC

("Allonhill").  Plaintiff/counterclaim defendant Allonhill filed an adversary proceeding against

defendant/counterclaim plaintiff Stewart Lender Services, Inc. ("SLS") asserting various causes of

action related to Allonhill's sale of assets to SLS under an asset purchase agreement ("APA"), and

SLS asserted several counterclaims, including a counterclaim for outstanding receivables owed to it

---

[1] By Order dated June 24, 2019, the Allonhill appeal (Civ. No. 19-879-LPS D.I. 1) and the SLS
cross-appeal (Civ. No. 19-938-LPS D.I. 1) were consolidated for procedural purposes under Civ.
No. 19-879-LPS ("Consolidated Appeals").

under the APA.  Following a five-day trial, the Bankruptcy Court issued its opinion (A1894)[2] and

order (A2024), *In re Allonhill, LLC*, 2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019)

("Decision"), denying Allonhill's claims for relief and damages and also denying SLS's

counterclaims.  Both parties appealed the Decision.

On Mach 31, 2020, this Court issued its Memorandum and Order, *Allonhill, LLC v. Stewart

Lender Services, Inc. (In re Allonhill, LLC)*, 2020 WL 1542376 (D. Del. Mar. 31, 2020) (D.I. 59,

60), which affirmed in part and remanded in part the Bankruptcy Court's Decision.  Allonhill has

filed a Motion for Rehearing or Clarification.  (D.I. 63) ("Rehearing Motion")

In its Rehearing Motion, Allonhill argues that the Court overlooked undisputed facts that

materially affected the Court's findings with respect Allonhill's fraudulent transfer claim and two

preference defenses.  Allonhill argues that the Court should reverse its ruling and hold that Allonhill

has established a claim for fraudulent transfer or remand that issue to the Bankruptcy Court.

Alternatively, Allonhill asserts that the Court should clarify its statement that Allonhill wrongfully

refused to pay certain amounts to SLS.

As there are no "overlooked facts" that would require the Court to reconsider its

Memorandum and Order, the Rehearing Motion is denied.

## II.    RELEVANT BACKGROUND[3]

### A.    The Parties and the Sale

In 2008, Allonhill was formed to provide mortgage due diligence and credit risk

management services.  In 2011, Allonhill was hired as the independent consultant for Aurora Bank

---

[2] The appendix (D.I. 24-27) to Allonhill's opening brief (D.I. 23) is cited herein as "A__," and the appendix (D.I. 38-41) to SLS's answering brief (D.I. 37) is cited herein as "S__."

[3] As the Court writes primarily for the parties, only a brief background of this dispute is included. Capitalized terms not defined herein shall have the definitions ascribed to them in the Memorandum (which contains additional background) and Order.

("Aurora").  (A1429 at 65)  Aurora terminated Allonhill on the basis of a conflict of interest, and thereafter Allonhill sued Aurora for payment of $22 million in outstanding receivables.  Aurora countersued for fraud, seeking the return of $24 million in fees it had already paid.  (A0338-39)

Meanwhile, facing financial difficulties, Allonhill marketed its business.  SLS emerged as the only interested buyer.  SLS proposed that part of its purchase price would be in the form of an earnout, and Allonhill agreed.  (S0327; A1598; A1461)  Extensive negotiations over the form of the earnout culminated in the execution of a letter of intent on June 27, 2013 (the "LOI").  (A1599; A1471; A1556)  Following due diligence, SLS approved the deal.  (A1605; A1608; A2757)  The APA was executed and the sale closed on August 28, 2013 ("Closing").  The final terms are memorialized in the APA and various related agreements.  (A2757; S0401; S0556; A2836)

Pursuant to the APA, SLS agreed to purchase substantially all of the assets of the Allonhill business (the "Business"), including all customer contracts and accounts receivable other than the disputed receivable related to the Aurora litigation.  (A2763; A2767)  As consideration, SLS paid Allonhill $15 million at the Closing, assumed Allonhill's go-forward liabilities (other than those associated with the Aurora litigation), and agreed to the earnout.  (A2767)

While SLS purchased all contracts and receivables at Closing, certain of Allonhill's customer contracts would not be formally assigned to SLS until after the Closing.  (A1618)  Given this delay, Allonhill would have to service those contracts in its name even post-Closing, until the subsequent assignment.  Because SLS hired substantially all of Allonhill's employees as of the Closing, the parties entered into an Employee Leasing Agreement ("ELA"), pursuant to which SLS would "lease" employees back to Allonhill, so that contracts could be performed in Allonhill's name.  The parties agreed that this arrangement would be cash neutral to Allonhill and that all receivables collected by Allonhill post-Closing would be turned over to SLS net of any actual costs incurred by Allonhill as the result of this arrangement.  (A1490; A1608-09)

3

The Business did not generate sufficient revenue to exceed the revenue hurdles in the APA necessary to trigger the earnout payments.  (A0337)  After three years of mounting losses, SLS sold the Business and other assets in December 2016 for less than $2 million.  (S0762; S0780)

**B.     Allonhill's Failure to Remit the Outstanding Amount**

After the August 2013 Closing, clients of the Allonhill Business – in connection with customer contracts, receivables, and rights to payment that had been purchased by SLS pursuant to the APA – continued to send payments by check and wire transfer to Allonhill ("Customer Collections").  (A0337)  These Customer Collections accrued at Allonhill from September 2013 through March 2014.  (A0337)

In November 2013, Allonhill raised the possibility of amending the APA to shift the start date for the earnout period, believing a later start date would benefit Allonhill.  (S0452-60; A1489-90)  SLS agreed to the amendment provided that Allonhill remit any then-outstanding Customer Collections to SLS, which Allonhill had to that point failed to do.  (S0458)  Allonhill accepted this condition.  (S0452-S0460)  The parties agreed on the amounts collected by Allonhill and the expenses Allonhill would be permitted to deduct, and then executed the amendment to the APA. (S0452; A2905)

In January and February 2014, Allonhill turned over Customer Collections to SLS totaling $6,608,309.15 (the "Turned Over Funds") through two separate transfers ("Transfers").  (A0338) Subsequent Customer Collections totaling $675,474.75 (the "Outstanding Amount") were collected by Allonhill after the last Turnover Date.

**C.     The Bankruptcy and the Adversary Proceeding**

On March 26, 2014, Allonhill filed for bankruptcy, in large part due to a March 5, 2014 Colorado trial court award to Aurora of $25.9 million ("Aurora Judgment").

On January 15, 2015, SLS filed a proof of claim against Allonhill seeking $675,474.75 –

that is, the Outstanding Amount.  (Adv. D.I. 23 Ex. C)[4]

On March 25, 2016, Allonhill initiated the adversary proceeding by filing a complaint.

(Adv. D.I. 1)  Subsequently, in an Amended Complaint, Allonhill asserted (among other things)

nine claims for avoidance and recovery of certain transfers – including the Turned Over Funds –

pursuant to Bankruptcy Code §§ 547(b), 548(a)(1)(B), 544(a) and (b)(1), and state law.  (Adv. D.I.

23)  With regard to Allonhill's claims to avoid and recover the Turned Over Funds, SLS countered

that (i) these were transfers of accounts and contract receivables that SLS had purchased as part of

the APA and, therefore, were not avoidable, and (ii) Allonhill had been solvent on the dates of both

Transfers.  SLS also asserted three counterclaims for breach of contract, conversion, and unjust

enrichment relating to the Outstanding Amount.

In the meantime, Allonhill pressed an appeal of the Aurora Judgment.  *See Allonhill, LLC v.*

*Aurora Commercial Corporation f/k/a Aurora Bank, FSB*, No. 14-CA-0740 (Colo. Ct. App.).  On

October 6, 2016, the Colorado appeals court affirmed the trial court's holding that Allonhill was

liable for breach of contract and fraud, but it reversed the trial court's damages order, concluding

that the Aurora contract's $2 million limitation on damages was enforceable.  The appeals court

remanded for the trial court to enter damages in favor of Aurora based on application of the

contractual damages cap.  On November 17, 2017, on remand, the Colorado trial court issued an

order entering judgment for Aurora in the amount of $2 million.  On June 6, 2018, Allonhill and

Aurora settled their litigation for $2.05 million.  (S1005-08)

---

[4] On March 3, 2015, the Bankruptcy Court approved the parties' agreement providing it exclusive
jurisdiction over the resolution and determination of any action between the parties "arising out of
the or relating to the APA," including any actions relating to any "Earnout Statement" and any
claims asserted by SLS.  (S0001)

### D.   The Decision

On April 25, 2019, the Bankruptcy Court issued the Decision in the adversary proceeding. The Bankruptcy Court ruled against Allonhill on its preference claim, finding that Allonhill was solvent as of the dates the Turned Over Funds were transferred, according the Aurora liability a value equal to the $2.05 million amount for which it ultimately was settled years after the relevant Transfers. *See Allonhill*, 2019 WL 1868610, at *20, *50. The Bankruptcy Court ruled that Allonhill's payment of the Turned Over Funds through the Transfers could not be challenged as fraudulent transfers separate and apart from the APA transaction, which was supported by adequate consideration. *Id.* at *47. The Bankruptcy Court also denied relief with respect to Allonhill's claims that SLS had breached sections 2.2(c) and 2.2(e) of the APA, *see id.* at *45-47, and SLS's claim that Allonhill had breached the APA by failing to remit the Outstanding Amount, *see id.* at *54. Accordingly, the Bankruptcy Court denied both parties' claims for relief and damages.

### E.   The Appeal

On May 20, 2019, Allonhill timely filed its Notice of Appeal from the Decision (A2025), and SLS timely filed its Notice of Cross-Appeal (S0011). The appeals were consolidated and fully briefed. (D.I. 23, 37, 48, 50) On March 6, 2020, the Court held oral argument. (D.I. 53; *see also* D.I. 56 ("Tr.")) After the argument, the parties submitted letter briefs relating to the status of SLS's cross-appeal. (*See* D.I. 56, 57) On March 31, 2020, the Court issued its Memorandum and Order.

With respect to its preference claim, Allonhill appealed the Bankruptcy Court's holding that it could not avoid the Transfers to SLS of the Turned Over Funds – that is, the $6,608,309.15 in Customer Collections remitted to SLS in January and February 2014 – as preferential payments. In response, SLS identified what it contended were three independent, adequate grounds on which the Decision on this preference claim could be affirmed: that Allonhill was actually solvent at the time of the challenged Transfers, that the Transfers were not antecedent debt but were already SLS's

6

property, and that Allonhill received new value (i.e., the amendment to the APA with respect to the earnout date) in exchange for the Transfers.

As set forth in the Memorandum, this Court disagreed with the Bankruptcy Court's determination that Allonhill was solvent at the time of the Transfers, as it disagreed that the appropriate measure of the Aurora debt was the $2.05 million for which the parties settled the Aurora litigation more than four years after Allonhill filed for bankruptcy. *Allonhill*, 2020 WL 1542376 at *7-*9. This Court's Order, therefore, remanded Allonhill's appeal of the preference rulings for the Bankruptcy Court to determine whether SLS's remaining two defenses to the preference claim require denial of Allonhill's claims and to make any necessary further factual findings. *Id.* at *7.

With respect to Allonhill's fraudulent transfer claims, Allonhill had alleged in the Bankruptcy Court that (1) the sale, as embodied in the APA, was a fraudulent transfer, and (2) when Allonhill undertook the Transfers after the Closing, they constituted separate transactions that were also constructively fraudulent. Allonhill did not appeal the Bankruptcy Court's ruling that the sale was not a fraudulent transfer. With respect to the Transfers, the Bankruptcy Court held that "Allonhill cannot assert a separate fraudulent transfer claim with respect to the Turned Over Funds" because "those amounts were transferred to SLS pursuant to the APA." *Allonhill*, 2019 WL 1868610, at *47. On appeal, this Court agreed. *Allonhill*, 2020 WL 1542376 at *11-12. As set forth in the Memorandum, the Bankruptcy Court correctly concluded that the APA was the product of a robust marketing process and arms'-length negotiations, the consideration SLS provided under the APA was reasonably equivalent value for the assets it acquired, and among those assets acquired pursuant to the APA were the Turned Over Funds. *Id.* at *11. The Court rejected Allonhill's argument that Bankruptcy Court's conclusion is "contrary to its finding that the consideration for the [Turned Over Funds] was the agreement to amend the start of the Earnout

7

Period." *Id.* at *11 (citing D.I. 28 at 44). "Rather, the Bankruptcy Court found that the agreement to amend the earnout period constituted new value sufficient to provide a defense to a potential preference claim. SLS had the right to the Transfers pursuant to the APA, but Allonhill thereafter wrongly refused to comply with its obligation to transfer such funds; subsequently, SLS induced Allonhill to comply with its transfer obligation (which was already an obligation imposed on Allonhill by the APA) by providing Allonhill the additional consideration of a delayed earn-out period." *Id.* at *11. "The Bankruptcy Court correctly held that Allonhill could not assert a fraudulent transfer claim relating to the Turned Over Funds separate and distinct from the claim it asserted in relation to the APA." *Id.* at *12.

Finally, the Bankruptcy Court's decision denying SLS's counterclaim with respect to the Outstanding Amount was remanded for clarification as to which element or elements of the counterclaim SLS failed to prove and to make any further factual findings or conclusions that are required. *Id.* at *15.

### E.       Current Procedural Posture

On April 6, 2020, SLS filed a notice of appeal of the Order to the U.S. Court of Appeals for the Third Circuit, seeking review of aspects of the Memorandum and Order which were adverse to SLS. (D.I. 61) On April 14, 2020, Allonhill filed the Rehearing Motion. (D.I. 63) On May 4, 2020, the parties filed a letter advising this Court that, pursuant to an uncontested stay request, the Third Circuit appeal is presently stayed pending this Court's decision on the Rehearing Motion. (D.I. 64)

## III.     JURISDICTION AND STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" and discretionary jurisdiction over appeals "from other interlocutory orders and decrees." 28 U.S.C § 158(a)(1) and (3).

A motion for rehearing under Bankruptcy Rule 8022 is subject to the same strict standard as a motion for reconsideration. *See In re Lau*, 684 F. App'x 235, 239 (3d Cir. 2017). "The test is whether (1) the court has patently misunderstood a party, (2) the court has made a decision outside the adversarial issues presented . . . by the parties; (3) the court has made an error not of reasoning but of apprehension; or (4) there has been a controlling or significant change in the law or facts since the submission of the issue to the Court." *Id.* (internal citation and quotation marks omitted). Like reconsideration motions, a motion for rehearing in this context is "to correct manifest errors of law or fact or to present newly discovered evidence" or new legal authority. *U.S. ex rel. Shumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 848-49 (3d Cir. 2014) (internal citation omitted). It is not a "vehicle for presenting new argument;" where a party "failed to raise [an] issue below or on appeal, she cannot now raise it for the first time in her Petition for Rehearing." *In re Genrette*, 2019 WL 4740053, at *9 (D. Del. Sept. 27, 2019), *aff'd*, 797 F. App'x 739 (3d Cir. 2020).

## IV.  DISCUSSION

Allonhill moves, pursuant to Bankruptcy Rule 8022, for rehearing of the Memorandum and Order but "only to the extent that the Court made certain findings and affirmed the Bankruptcy Court's dismissal of Allonhill's fraudulent transfer claim." (D.I. 63 at 2)  According to Allonhill, the Court overlooked several material facts, requiring reversal of the dismissal of the fraudulent transfer claim, as well as amendment of the Court's factual findings relating to the fraudulent transfer claim and Allonhill's two preference defenses.  In the event that the Court does not reverse its affirmance of the Bankruptcy Court on the fraudulent transfer claim, Allonhill requests in the alternative that the Court revise the Memorandum to clarify that Allonhill did not wrongly fail or refuse to make the $675,474.75 in collections on customer contracts, receivables, and/or rights to payment which SLS contends that it purchased pursuant to the APA but which remained with the Allonhill estate at the time of the Decision ("Cash Collections").

Bankruptcy Rule 8022 states that "[t]he motion must state with particularity each point of law or fact that the movant believes the district court or BAP has overlooked or misapprehended and must argue in support of the motion." Fed. R. Bankr. P. 8022(a)(2). In the Rehearing Motion, Allonhill identifies eight facts it contends the Court overlooked. (*Id.* at 12-18)

In Allonhill's view, the Court made the following incorrect findings: (1) assets purchased by SLS under the APA included "all customer contracts and accounts receivable other than the disputed receivable related to the Aurora Litigation," and that the $15 million paid at closing was consideration for the purchase of all contracts; (2) pursuant to the ELA Amendment, that "all receivables collected by Allonhill post-Closing would be turned over to SLS net of any actual costs incurred by Allonhill;" (3) Allonhill agreed in the APA Amendment to remit Cash Collections to SLS, "which Allonhill had to that point failed to do;" (4) "Allonhill stipulated that the Transfers represent collections on 'customer contacts, receivables, and right to payment that had been purchased by SLS pursuant to the APA;'" (5) the arrangement regarding Cash Collections and ELA payments was "cash neutral" to Allonhill; and (6) SLS agreed to the APA Amendment in exchange for Allonhill's remittance of "any then-outstanding" Cash Collections, "which Allonhill was already obligated to do but refusing nonetheless." (D.I. 63 at 12-16) Relatedly, according to Allonhill, this Court then (7) improperly determined that the Bankruptcy Court "correctly concluded" that the Transfers were amounts that had been transferred pursuant to the APA, and that $15 million was reasonably equivalent value for the Transfers (together with other assets acquired through the APA); and (8) improperly held that "SLS had the right to the Transfers pursuant to the APA, but Allonhill thereafter wrongly refused to comply with its obligation to transfer such funds." (*Id.* at 16-18)

SLS urges the Court to reject what it describes as Allonhill's "post-hoc factual narrative, raised for the first time after several years of litigation, which defies the evidentiary record and

10

common sense." (D.I. 68 at 1)  According to SLS, the Court should deny the Rehearing Motion, without even reaching the merits, on the basis that Allonhill relies on arguments it has never raised before in these proceedings.  (*Id.* at 10; *see also Genrette*, 2019 WL 4740053, at *9)  Alternatively, SLS contends that the Court should deny the Rehearing Motion on the merits.  (*See* D.I. 68 at 10)

In the Court's view, the Rehearing Motion essentially rests on two premises which Allonhill characterizes as both overlooked and undisputed.  (*See* D.I. 63 at 3-5, 12-17)  First, according to Allonhill, SLS did not purchase "unassigned contracts" pursuant to the APA.  (*Id.* at 4-5)  Second, Allonhill adds, post-October 31, 2013, Allonhill continued to collect receivables in connection with such "unassigned contracts," which receivables Allonhill contends it had the legal right to retain. (*Id.* at 5)  The Court agrees with SLS that the Rehearing Motion must be denied both because it rests on arguments never before raised by Allonhill and also because Allonhill's arguments lack merit under the applicable legal standard.

## A.     SLS's Purchase of "Unassigned Contracts"

The Bankruptcy Court's ruling on Allonhill's fraudulent transfer claim turns on its conclusion that there is no separate claim with regard to the Transfers because "those amounts were transferred to SLS pursuant to the APA." *Allonhill*, 2019 WL 1868610 at *47.  In the Rehearing Motion, Allonhill asserts that "there were large unassigned contracts at the time of the APA closing in August 2013 and the APA expressly did not transfer those contracts and potential receivables." (D.I. 63 at 4; *see also id.* at 15 ("SLS did not purchase the unassigned contracts or their receivables through the APA."))  "Thus, contrary to this Court's finding, the $15 million consideration paid pursuant to the APA does not cover the unassigned contracts."  (*Id.* at 4-5)

Contrary to Allonhill's new contention, the record provides ample support for the determination that all contracts of the Allonhill business unrelated to the Aurora dispute were

purchased by SLS pursuant to the APA, including those contracts that could not be assigned until after the Closing.

Pursuant to APA Section 1.1(a), Allonhill sold, and SLS acquired, all rights and interests in the "Target Assets," other than the "Excluded Assets" – i.e., a potential receivable from the Aurora litigation. (A2763-64; *see also* A2764-2765 (defining limited scope of "Excluded Assets" essentially as Allonhill's "permanent accounting or Tax records," "employee benefit plans," contracts and claims under Allonhill's insurance policies, tax refunds and rebates for pre-closing period, any claims or interest in Aurora litigation, Allonhill's email server and pre-closing emails related to Aurora litigation, and "any and all Excluded Contracts unless and until such time as they may become an Assumed Contract hereunder")) "Assumed Contracts" are defined as "the Contracts to which Seller is a party and used in connection with the Business . . . set forth on Section 1.1(a)(v) of the Seller Disclosure Schedule" and include "all accounts and other amounts receivable of the Business." (A2764)

The Assumed Contracts identified on the Seller Disclosure Schedule included major contracts that could not be assigned pre-Closing. For example, an Allonhill witness testified that two large contracts with Freddie Mac (codenamed Elbert and Humboldt) could not be transitioned pre-Closing (A1526 at 405:20-406:5, A1535 at 444:2-9), yet those contracts are expressly included as Assumed Contracts on the Seller Disclosure Schedule. (B.D.I. 143 at 57-59)

SLS's CEO, Jason Nadeau, explained that, because of customer requirements, certain contracts could not be formally assigned to SLS until after Closing, but that "ultimately they all did" get assigned. (A1618 at 119-20) Testimony of both Nadeau and Sue Allon, the heads of the two businesses at the time of the deal, confirmed that, pursuant to the APA, SLS purchased all of Allonhill's customer contracts and accounts receivable, even those that could only be assigned post-Closing. As Sue Allon testified:

12

> Q. So that means -- so this agreement [the ELA] was put in place to deal with contracts that were going to be assigned post-closing, right?
>
> A: Right.
>
> Q. And Allonhill was going to continue to collect revenues under those contracts but had agreed that it would turn those revenues over to SLS who had purchased those contracts as part of the deal, right?
>
> A: Correct.

(A1490 at 310-11) Jason Nadeau further testified:

> Q. And in connection with the APA, did SLS purchase all of Allonhill's customer contracts and accounts receivable other than those associated with the Aurora litigation?
>
> A. We did.

(A1619 at 121)

In support of its argument, Allonhill relies on Section 6.6(d) of the APA, which provides that "certain consents to the Transaction may be required from certain third parties (including parties to Assumed Contracts)" and recognizes that such consents "may not be obtained." (A2785, ¶ 6.6(d)) According to Allonhill, Section 6.6(a) serves as "additional proof that SLS did not pay the initial consideration in the APA" for the contracts which would need to be assigned post-Closing. (D.I. 63 at 7 & n.3) Rather, Allonhill suggests, if the contemplated consents were obtained post-Closing, then "Allonhill had the opportunity to obtain additional consideration through the earnout provision in the APA." (*Id.*)

Allonhill's arguments are rejected because they are new (and needed to be raised earlier), because they fail to meet the stringent standards for reconsideration, and because (in any event) they are wrong on the merits.

Section 6.6 of the APA supports the conclusion that SLS purchased the "unassigned contracts" which would need to be assigned post-Closing. Section 6.6(a) requires the parties to use "commercially reasonable efforts to obtain as soon as practicable all consents and approvals,"

13

including "any third party consents required under any Assumed Contracts." (A2785)  It follows that the "Assumed Contracts" being purchased pursuant to the APA included contracts with respect to which third-party consent would be obtained post-Closing.  As SLS correctly points out, even if the $15 million paid to Allonhill at Closing was not intended to compensate Allonhill for the unassigned contracts (a point for which Allonhill offers no evidence), the earnout was also a component of the APA consideration.  Accordingly, whether through the upfront consideration or the earnout, SLS paid for the unassigned contracts.

There is no support in the APA or elsewhere in the record for Allonhill's contention that the Assumed Contracts acquired by SLS did not include unassigned contracts.  This contention, therefore, does not provide a meritorious basis on which to grant the Rehearing Motion.

**B.  Allonhill's Obligation to Remit the Turned Over Funds to SLS**

Allonhill further contends that the Court overlooked the fact that it had no obligation to turn over Customer Collections paid to it after October 31, 2013.  Allonhill argues that Section 6.12 of the APA recognized that, through the original term of the ELA (which ended on September 30, 2013), Cash Collections from customers under both the assigned and unassigned contracts would be sent to Allonhill in the first instance, and that Allonhill would have the right to retain such proceeds, subject to certain deductions.  (D.I. 63 at 4)  The ELA Amendment extended the original term of the ELA to October 31, 2013.  (*Id.*)  Customers continued to send payments to Allonhill even after that date.  (*Id.*)  When the parties entered into the APA Amendment in January 2014, they did not extend the term of the ELA Amendment, and they amended section 6.12 of the APA with a new provision that covered Cash Collections only through October 31, 2013.  (*Id.* at 4-5)  Therefore, Allonhill argues, it had no obligation to pay SLS the Cash Collections that post-dated October 31, 2013.  (*Id.* at 5)

According to SLS, Allonhill's argument is based on two false premises that have no support in the factual record: (1) that any contracts remained unassigned after the October 31, 2013 expiration of the ELA; and (2) that any of the Turned Over Funds consisted of receivables on unassigned contracts collected after October 31, 2013. Rather, SLS contends, the record demonstrates that (1) all contracts were ultimately assigned to SLS, and (2) the Turned Over Funds consisted of accounts receivable purchased by SLS under the APA.

As an initial matter, SLS argues that Allonhill has never contended, as it does now, that post-October 2013 payments came from unassigned contracts for which Allonhill "had no contractual obligation to turn over" accounts receivable. (D.I. 63 at 3, 8, 9, 13) The Court finds a version of this argument in Allonhill's reply brief filed in support of its appeal to this Court. (*See* D.I. 49 at 27) However, the Court does not see this argument raised anywhere in the Bankruptcy Court. Instead, as SLS points out, in the Bankruptcy Court it was stipulated that the Turned Over Funds remitted via the Transfers constituted "receivables and rights to payment that had been purchased by SLS pursuant to the APA." (A0337 at ¶ 15) Allonhill now contends that this stipulation does not specifically refer to the "Transfers," but this is unavailing: the next three paragraphs in the stipulation do specifically reference cash collections received and then the Transfers back to SLS. (A0337-A0338 at ¶ 16-18) Moreover, Allonhill also stipulated that the $675,474.75 in Customer Collections that Allonhill collected after the last of the Transfers constituted "collections on customer contracts, receivables and/or rights to payment purchased by SLS pursuant to the APA" (A0338 at ¶ 19), which there would have been no reason for Allonhill to have agreed to if Allonhill were contending (as it does, belatedly, now) that it had no obligation to turn over funds collected after October 31, 2013.

There is no clear error in the Bankruptcy Court's reliance on the parties' stipulated facts, including that the Turned Over Funds constituted amounts purchased by SLS pursuant to the APA.

Additionally, Allonhill does not identify any contracts which remained unassigned after the October 31 expiration date of the ELA; nor does it identify any of the Turned Over Funds which consisted of receivables on unassigned contracts collected after October 31.  To the contrary, Jason Nadeau's testimony that, ultimately, all contracts were assigned to SLS is not contradicted in the record. (A1618 at 119-20)  Nadeau's testimony is confirmed by the Year One Earnout Statement, which shows SLS generating revenue during November 2013 (the first month post-ELA) from all of Allonhill's major customers, including Freddie Mac and Fannie Mae.  (S0553-55)

Accordingly, any receivables collected by Allonhill after October 31, 2013 were either for (1) work performed during the term of the ELA,[5] or (2) work performed after expiration of the ELA by SLS employees on contracts that had been assigned to SLS.[6]  Under either scenario, those receivables belonged to SLS, and Allonhill had no right to retain them.

Absent affirmative evidence that that any contracts remained unassigned after the expiration of the ELA on October 31, 2013, or that Allonhill received payments under unassigned contracts after that date, Allonhill's Rehearing Motion must fail.

---

[5] Pursuant to APA Section 6.12, as amended by the First Amendment, all accounts receivable collected during the term of the ELA, net of any actual costs incurred by Allonhill, were to be remitted to SLS.  (A2905)  Allonhill's contemporaneous emails confirm that the reconciliation at the time of the APA Amendment was meant to cover all payments collected by Allonhill from September (i.e., the closing of the Sale) forward, net of only Allonhill's actual expenses.  (*See* S0455-57) ("reconciled amount owed to Stewart as of 12/1" reflects "Amount due to Stewart (for September through November)")

[6] As Jason Nadeau testified, there were customers that mistakenly continued to remit payments to Allonhill even after contracts were assigned.  (A1619 at 121)

16

## V.    CONCLUSION

As there are no "overlooked facts" that would require the Court to reconsider its decision, the Rehearing Motion is denied.  An appropriate Order follows.

November 20, 2020
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

17